Filed 8/20/21  Mattoo v. 24/7, Inc. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| ARVIND MATTOO et al., | H046474 |
| Plaintiffs and Respondents, | (Santa Clara County Super. Ct. No. 1-13-CV-240918) |
| v. | |
| 24/7, INC., | |
| Defendant and Appellant. | |

This is the second appeal in a breach of contract action brought by plaintiffs and respondents Arvind Mattoo and Kanchan Gupta (trustees), as trustees of the Rajat A. Gupta Family Irrevocable Trust (the Trust), against defendant and appellant [24]7.ai, Inc. (24/7 or the company), a business process outsourcing (BPO) company.

24/7 chief executive officer P.V. Kannan co-founded the company in 2000. In 2001, 24/7 engaged Rajat Gupta, a prominent businessman, as an advisor.  In exchange for Gupta's agreement to provide advisory services, 24/7 offered him the option to purchase 1 percent of the company, or 84,000 shares of 24/7 stock.  Those shares were scheduled to vest over four years.  At Gupta's request, 24/7 granted the stock option to the Trust.  The Trust exercised the option and paid the fair market value of $15,960 for the stock.  Kannan and other members of 24/7's board of directors were dissatisfied with Gupta's performance as an advisor, but nevertheless permitted his options to vest as scheduled until February 2005.  At that time, Kannan informed Gupta that his stock option was terminated because of his involvement with 24/7's competitors.  Shortly

thereafter, Kannan and Gupta spoke on the phone. Gupta was angry; he said he was "well connected" and that Kannan did not want to make "an enemy" out of him. Kannan decided not to cancel Gupta's shares. After those shares fully vested, however, 24/7 refused to deliver the stock certificate to the Trust. The trustees sued 24/7 for breach of the option agreement, among other claims.

In the prior appeal, this court reversed the trial court's entry of judgment in favor of the trustees following a grant of the trustees' motion for summary adjudication of their breach of contract claim and 24/7's affirmative defenses. (*Mattoo et al. v. 24/7, Inc.* (Dec. 18, 2015, No. H041398) [nonpub. opn.] (case No. H041398).) We concluded that the trial court had correctly granted summary adjudication to the trustees on their breach of contract cause of action, but that 24/7 had raised triable issues of material fact as to at least one of its affirmative defenses. Accordingly, we reversed and remanded for a trial on 24/7's affirmative defenses.

On remand, the case proceeded to a jury trial. 24/7 argued that the option agreement was procured by fraud and that, to the extent that 24/7 ratified the agreement, that ratification was invalid, having been given under economic duress. On a special verdict form, the jury accepted 24/7's fraud in the inducement defense to the enforcement of the option agreement, finding that 24/7 had entered into the agreement in reliance on a false promise by Gupta to introduce the company to customers. The jury further found that 24/7 had ratified the option agreement after learning of the false promise, but that 24/7's ratification resulted from economic duress, making it invalid.

The trustees moved for judgment notwithstanding the verdict (JNOV), arguing that the jury's duress findings were unsupported by substantial evidence. Alternatively, the trustees moved for a new trial on the basis of attorney misconduct. The trial court granted both motions and entered judgment in favor of the trustees. 24/7 appeals. We conclude that the jury verdict is not supported by substantial evidence and shall therefore affirm the judgment in favor of the trustees.

2

## I. BACKGROUND

### A. Factual Summary

Kannan co-founded 24/7 in April 2000. 24/7 was Kannan's second start-up; his first was purchased by a technology company in 1999. 24/7 began as a business process outsourcing company focused on customer service functions. It offered labor services for chat and e-mail management out of a contact center it built in Bangalore, India. Initially, 24/7 planned to offer its services to Silicon Valley start-ups. However, after the dot com bubble burst in 2000, the company shifted its strategy to focus on recruiting Fortune 500 companies as customers.

Lacking connections into those companies, Kannan and his co-founders considered engaging advisors with more extensive networks among Fortune 500 executives. One of the people Kannan wanted to act as an advisor was Gupta. At the time, Gupta was head of the prestigious management consulting firm McKinsey & Company; chairman of the Global Fund for AIDS, Malaria, and Tuberculosis; and chairman of the Gates Foundation board. Like Kannan, Gupta was born in India. Kannan had followed Gupta's career in the press and considered him a role model.

A 24/7 investor introduced Kannan to Gupta's protégé at McKinsey, Anil Kumar, in February 2001. Kannan told Kumar of his desire to have Gupta become an advisor to 24/7. Kumar said he would talk to Gupta and find out if he was interested. In later conversations, Kumar told Kannan that 24/7 would have to hire both Kumar and Gupta and that they would not agree to be advisors for less than a 1 percent stake in the company each. According to Kannan, over the course of conversations with Kumar and Gupta, it was agreed that Gupta would leverage his network of senior executives to provide 24/7 with introductions to potential customers, while Kumar would advise on strategy. Gupta also agreed to join 24/7's advisory board and to allow 24/7 to use his name. Kannan testified that Kumar and Gupta also orally agreed not to work with 24/7's competitors. In exchange, 24/7 agreed to give Kumar and Gupta each the option to

purchase 84,000 shares of 24/7 stock at their fair market value of $0.19 per share, with the shares vesting over four years.

The foregoing oral agreements regarding the specific advisory services to be provided were not reduced to writing. According to Kannan, Kumar refused to include specifics, instead suggesting language indicating that the options were granted "[a]s a token of appreciation for the guidance and support provided during the early stages of the formation of 24/7 customer.com."

On April 11, 2001, Kannan sent Gupta the Notice of Grant of Stock Option, Notice of Exercise, Joint Escrow Instructions, Stock Option Agreement, and 2000 Stock Option Plan along with a cover letter, which stated that the stock option was being granted "[a]s a token of appreciation for the guidance and support provided during the early stages of the formation of 24/7 customer.com Inc." The Trust exercised the option to purchase all 84,000 shares and paid the exercise price of $15,960. The first vesting date was one year from the date the options were granted, followed by quarterly vesting dates. Kannan testified that the options vested over time to allow 24/7 to determine "if the relationship was working" and, if it was not, to cancel the arrangement and buy back the unvested shares.

24/7 emailed Gupta lists of target customers. Despite repeated promises and reassurances, Gupta never provided customer referrals or introductions. Early on, Kannan considered terminating the relationship, but reconsidered after talking with Gupta, thinking Gupta would carry through on his promises. Kannan acknowledged that he could have terminated the agreement and negotiated a new one that "actually put into writing" the requirement that Gupta "make introductions," but he did not because "the reassurances were very convincing."

Sequoia Capital, a venture capital firm, invested in 24/7 in 2003.

4

In 2004, Kannan learned that Gupta was involved with one of 24/7's competitors, vCustomer. There were rumors that Gupta was involved with other companies that competed with 24/7 as well.

On February 8, 2005, Kannan informed Gupta in writing that 24/7 was "terminat[ing]" his stock option due to his "involvement with competitors of the Company," which Kannan wrote "breach[ed]" Gutpa's agreement with 24/7 and was "contrary to the underlying spirit of the stock option grant itself." 24/7 also sent Gupta a check for $15,960 to reimburse him for the money paid to exercise the stock option.

In response, Gupta emailed Kumar: "If you feel comfortable, could you call PV Kannan and say that we've already helped him before and that [terminating the stock option] would be completely unwarranted and unprecedented and I don't think they would want the resultant actions I could take, or as having me as an active adversary." Kumar did not relay that precise message to Kannan, but Kumar did inform Kannan that Gupta was very mad and advised Kannan to have a phone conversation with Gupta.

Kannan and Gupta spoke on the phone on February 25, 2005. Kannan testified that Gupta said during that call, "I'm very well connected, and you definitely don't want to make an enemy out of me." Kannan believed that if Gupta "drops the word in . . . that 24/7 is not a company to be trusted to give reliable service, that would have an immediate effect." Kannan testified that he "agree[d] to a reset of the relationship [between 24/7 and Gupta] in that conversation." He further testified that, following the conversation, he and his co-founders "reexamined our options and decided not to fight Gupta on this." In October 2005, Kannan told his management team that the grant of shares to the Trust would remain.

In August 2008, Gupta's accountant requested the stock certificate. Kannan testified that 24/7 ignored the request; he "didn't feel it was right to give [Gupta] the stock certificates" "[b]ecause he had not offered any services and never, you know, did

5

anything." 24/7 failed to provide the stock certificate in response to numerous requests by Gupta's representatives.

### B. Procedural History[1]

The trustees filed suit against 24/7 on February 8, 2013, asserting a breach of contract claim (and other causes of action not at issue here). The trustees alleged 24/7 had breached the option agreement by wrongfully withholding shares of stock it sold to the Trust. 24/7 filed an answer in which it asserted a number of affirmative defenses, including statute of limitations and fraudulent inducement.

In 2014, the trustees moved for summary adjudication of their breach of contract claim and of 24/7's affirmative defenses. The trial court granted the trustees' motion and entered judgment in their favor. On appeal, a different panel of this court reversed, concluding that, while the trial court had correctly granted summary adjudication to the trustees on their breach of contract cause of action, 24/7 had raised triable issues of material fact as to at least one of its affirmative defenses. The matter was remanded for a trial on 24/7's affirmative defenses.

The trial took place in 2018. The jury returned a special verdict on June 4, 2018, in which it made findings regarding 24/7's fraudulent inducement defense, the Trust's ratification argument, and 24/7's economic duress defense to the ratification. Specifically, the jurors found that (1) Gupta promised to introduce 24/7 to potential customers, (2) that promise was false when made, (3) that promise was made to persuade 24/7 to enter the option agreement, (4) 24/7 reasonably relied on that promise, (5) 24/7 would not have entered into the agreement if it had known that the promise was not true, (6) 24/7 affirmed the contract after learning that the promise was false, (7) Gupta used a wrongful act or threat to pressure Kannan into affirming the contract, (8) Kannan was so afraid or intimidated by the wrongful act or threat that he did not have the free will to

---

[1] We take portions of the procedural history from this court's opinion in the prior appeal, case No. H041398.

6

refuse to affirm the contract, and (9) Kannan would not have affirmed the contract without the wrongful act or threat.

The trustees moved for a JNOV or, in the alternative, a new trial. The trustees sought a JNOV on sufficiency of the evidence grounds, arguing that the jury's economic duress findings were unsupported by substantial evidence. The trustees argued that duress is evaluated under a subjective standard—whether Kannan was so afraid or intimidated by the wrongful act or wrongful threat that he did not have the free will to refuse to consent to the contract—relying on CACI No. 332. In its opposition, 24/7 argued that the special verdict was supported by substantial evidence. 24/7 asserted that economic duress is evaluated under an objective standard—whether a reasonable person in Kannan's position would have believed that there was no reasonable alternative except to consent to the contract—as set forth in CACI No. 333, with which the jury was instructed. On reply, the trustees noted that the jury was instructed with CACI No. 333, but the special verdict form tracked CACI No. 332. They argued that the two standards (objective and subjective) were "consistent," making any error harmless.

The trial court judge requested additional briefing on the inconsistency between the instructions and the special verdict form. In response, the trustees changed course, maintaining that CACI No. 333 (not CACI No. 332) stated the correct standard, that the special verdict form was contrary to the law, and that the Trust was harmed by the erroneous special verdict form, such that a new trial or JNOV was warranted.

The trustees also moved for a new trial on grounds of attorney misconduct, maintaining that counsel for 24/7 repeatedly disparaged the Trust's counsel despite repeated warnings against such conduct from the trial court.

The trial court granted a new trial as to the affirmative defense of fraud in the inducement and the related issues of ratification and duress. The court also granted the JNOV motion, concluding that there was insufficient evidence of the first two elements of economic duress—namely, a wrongful act and that a reasonable person in Kannan's

7

position would have believed that he had no reasonable alternative except to ratify the option agreement. Therefore, the court vacated the jury's findings that Gupta used a wrongful act or threat to pressure Kannan into affirming the contract, that Kannan was so afraid or intimidated by the wrongful act or threat that he did not have the free will to refuse to affirm the contract, and that Kannan would not have affirmed the contract without the wrongful act or threat. The court entered judgment in favor of the trustees.

24/7 timely appealed.

## II. DISCUSSION

### A. Legal Principles

#### 1. Standard for Granting a JNOV and Standard of Review

" ' "A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied." ' [Citations.] [¶] 'On appeal, we review the motion de novo. "[W]e determine whether substantial evidence supported the verdict, viewing the evidence in the light most favorable to the party who obtained the verdict. [Citation.] We resolve all conflicts in the evidence and draw all reasonable inferences in favor of the verdict, and do not weigh the evidence or judge the credibility of witnesses." ' [Citation.]" (*Collins v. County of San Diego* (2021) 60 Cal.App.5th 1035, 1048.)

#### 2. Economic Duress

Economic duress is "a basis for vitiating a coerced party's consent to an agreement." (*Tarpy v. County of San Diego* (2003) 110 Cal.App.4th 267, 277.) "Economic duress requires an unlawful or 'wrongful act which is sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure.' [Citation.]" (*Hester v. Public Storage* (2020) 49 Cal.App.5th

8

668, 679; CACI No. 333) " 'The underlying concern of the economic duress doctrine is the enforcement in the marketplace of certain minimal standards of business ethics. Hard bargaining, "efficient" breaches and reasonable settlements of good faith disputes are all acceptable, even desirable, in our economic system.' [Citation.] But, the system disdains 'the wrongful exploitation of business exigencies to obtain disproportionate exchanges of value. . . . The economic duress doctrine serves as a last resort to correct these aberrations when conventional alternatives and remedies are unavailing.' [Citation.]" (*Hester v. Public Storage*, *supra*, at p. 679.)

### B.    *The Verdict is Not Supported by Substantial Evidence*

At issue is whether the trial evidence was sufficient to establish an economic duress defense to 24/7's ratification of the option agreement. As the parties agree, economic duress requires demonstrating, among other things, that a reasonable person would have believed that there was no reasonable alternative but to consent to the contract.

No evidence was presented from which the jury could have inferred that 24/7's only reasonable course of action was to ratify the option agreement. One obvious alternative would have been to carry through with the plan to cancel Gupta's shares. The record contains no evidence of the likely economic impact of that alternative on the company from which the jury could have assessed its reasonableness. For example, no evidence was presented to the jury as to 24/7's key financial metrics in February 2005, such as its cash balance, monthly recurring revenue, and monthly operating expenses. Nor was evidence presented regarding its customer base, such as number of customers at that time, the relative size of those customers, customer retention rate, or average contract length (i.e., on average, had customers signed monthly, annual, or multi-year contracts with 24/7). Without the foregoing information, jurors could assess neither the likelihood

9

that 24/7 would have lost existing customers had Gupta carried out his threat nor the reasonableness of risking the loss of those customers.[2]

The only evidence as to the potential impact of not ratifying the option agreement is Kannan's testimony that, if Gupta were to tell his network that "24/7 is not a company to be trusted to give reliable service, that would have an immediate effect." But the *nature* or *magnitude* of that effect was not explored at trial. Did Kannan anticipate an effect on the company's ability to recruit new customers, retain existing customers, both? If he anticipated losing existing customers, how many? Was he positing an effect on the company's ability to raise additional financing, or perhaps on its ability to attract and retain talent? What was the likely impact on the bottom line? The jury could only speculate.

24/7 urges that jurors reasonably could have inferred that the company would have lost "many existing . . . customers" if Gupta had carried out his "threatened disparagement campaign." We disagree that the record supports such an inference. Kannan testified that, when a company decided to outsource its customer service to a BPO provider such as 24/7, "[i]t required quite a . . . bit of work" on the part of the company "to make it successful." He explained that 24/7 would "need to connect to [the company's] internal IT systems" and "connect to their network. So there's a lot of effort that the company does to make sure that that data, the information of that agency, is kept secure. [¶] Once that is done, then, . . . trainers arrive on site to train the staff at 24/7 who will be performing the services. And in the initial weeks of the launch, typically there will be half a dozen people from the client's side to continue to monitor and understand how 24/7 is performing. [¶] So there's a level of cost and time involvement

---

[2] Kannan testified that 24/7 was "small" and "vulnerable" in 2005 and that it had 20 customers at that time, but that testimony was not heard by the jury. Kannan made those statements outside the presence of the jury in response to questions posed by the trial court to elicit evidence that might be relevant in the event a court trial was required on any issues.

required to make this work." The foregoing testimony compels the inference that it is likewise costly for a company to change from one BPO provider to another. Given that high transaction cost, and without additional evidence, jurors could not reasonably infer that a significant number of 24/7's customers would have incurred the cost of changing BPO providers based solely on Gupta's negative view of 24/7.

In sum, the trial court did not err in granting the trustees' motion for JNOV because there is insufficient evidence to establish an economic duress defense and, by extension, to support the verdict. In light of that conclusion, we need not address whether there was sufficient evidence of a wrongful act, the trustees' argument that the special verdict form was fatally defective, or the order granting a new trial.

## III. DISPOSITION

The judgment is affirmed. The trustees shall recover their costs on appeal.

11

_____

ELIA, ACTING P.J.

WE CONCUR:

_____

BAMATTRE-MANOUKIAN, J.

_____

DANNER, J.

*Mattoo et al. v. 24/7, Inc.*
H046474